# CHARLESTON.

DOONAN v. GLYNN *et al.*

Submitted September 8, 1886.—Decided October 30, 1886.

| | |
|---|---|
| 28 | 715 |
| 29 | 116 |
| 29 | 472 |
| 30 | 195 |
| 31 | 141 |
| 31 | 571 |
| 31 | 591 |
| 32 | 44 |
| 33 | 165 |
| 33 | 278 |
| 33 | 510 |
| 28 | 715 |
| 35 | 713 |
| 36 | 683 |
| 28 | 715 |
| 37 | 14 |
| 28 | 715 |
| 38 | 81 |
| 28 | 715 |
| 42 | 580 |
| 28 | 715 |
| 43 | 419 |
| 28 | 715 |
| 49 | 132 |
| 28 | 715 |
| 54 | 191 |
| 54 | 700 |
| 28 | 715 |
| 55 | 661 |
| 28 | 715 |
| 56 | 328 |
| 57 | 187 |

1. Facts in controversy on the trial of an issue not necessarily involved in the issue, though ever so important in its determination, are not settled by the judgment on the issue, but are open to controversy in any other suit between the same parties or their privies. (p. 725.)

2. Where the decree sought to be reversed is based upon depositions, which are so conflicting and of such a doubtful and unsatisfactory character, that different minds and different judges might reasonably disagree as to the facts proven by them, the Appellate Court will decline to reverse the decree, though the testimony may be such, that it might have pronounced a different decree, if it had acted upon the case in the first instance. (p. 731.)

*J. T. McGraw* for appellant.

*Martin & Woods* for appellee.

Statement of the case by GREEN, JUDGE:

The bill in this case filed at June rules, 1883, by John Doonan avers, that in the spring of 1873 he sold Patrick Glynn a certain lot in Grafton (No. 77) for a sum left blank in the bill; that a settlement of accounts was had between them about May 10, 1873, when Glynn was found indebted to him $250.00 on account of this purchase; and that on that day he executed to him a deed for this lot retaining a lien upon it on the face of the deed for the unpaid purchase-money, $250.00, which has never been paid; and this bond is filed with the bill. It is a simple bond payable in one day after its date, May 10, 1873, and is stated to be for value received in this lot (No. 77). The bill also states, that on January 11, 1882, said Glynn conveyed to Leonidas S. Johnson lot (No. 77) subject to the life-estate of Glynn; and the bill sought to have this lot sold to pay this unpaid purchase-money, that was reserved on the face of the deed as a vendor's lien, and asked, that Glynn, who had possession of this deed and had never recorded it, should be required to produce it.

The defendants in their answers admit the execution of this deed by the plaintiff Doonan to Glynn and say the price of the lot was $300.00, but they deny, that any lien was retained to pay any part of the purchase-money, the whole of which had been paid off including this bond of $250.00 filed with the plaintiff's bill in a few days after it was given, stating the mode of payment, and that on January 30, 1882, the plaintiff sued the defendants for this lot in an action of ejectment brought in the circuit court of Taylor, which suit resulted in a verdict and judgment for the defendants March 27, 1883; that the deed made to him was not re-produced because it is already in the plaintiff's hands, Glynn having placed it there for safe-keeping about July 18, 1883, and as it had not been recorded, the plaintiff fraudulently pretends, that a vendor's lien was retained on the face of the deed.

The plaintiff's deposition was taken on his own behalf. He testified, that he verbally sold said lot to Glynn in the spring of 1873 for $350.00, and about the same time he received from Glynn a note on George Avington for $300.00; and at same time Glynn being unable to do so himself contracted with him to improve this lot (No. 77) and furnish the means of so doing, stating that the house and lot would be good for the amount so expended. He accordingly built a house on the lot and made other improvements costing $160.00; that during the progress of this work and near its conclusion he had this settlement with Glynn, and it was ascertained Glynn owed him this $250.00, for which Glynn gave him his bond; and at the same time the plaintiff delivered to Glynn a title-bond, which Glynn some time afterwards returned to him stating, he did not believe he could keep the property, as the officers of the law were after him for being engaged in some illegal traffic; that he had found this title-bond since the last term of the court and produced it.

The plaintiff's bill was dismissed with costs by a decree entered November 19, 1883. An appeal was taken by the plaintiff, Doonan, to this Court; and this Court being of opinion, that the case proven and that alleged differed so materially, that the plaintiff had no right to a decree in his favor, but inasmuch as the proofs showed, he had a cause of

action of a similar nature to that alleged in his bill, and such as he might make available by a proper amendment of his bill, we adjudged, that the court ought not to have dismissed his bill without giving him an opportunity to amend it. The decree of the circuit court was therefore reversed, and the cause remanded to the circuit court of Taylor county with leave to the plaintiff to amend his bill, if he should ask to do so in a time deemed reasonable by the court, and for further proceedings to be had. This decision was rendered by our Court on July 3, 1885, and is reported in 26 W. Va. 225. In this report a fuller and more perfect statement of the case, as then presented to our Court, may be found.

Upon the receipt of the mandate of our Court the circuit court of Taylor at its August term, 1885, remanded this cause to rules with leave to the plaintiff to amend his bill, and at the October rules, 1885, he did file his amended bill. In this amended bill he states his case, as it was proven by his deposition, the substance of which I have stated above, and he claims, that as shown by said title-bond there is due, unpaid and owing him of the purchase-money of said lot (No. 77) $235.00 with interest from May, 1873, which has been paid by neither of the defendants and no one for them; and he claims the right to enforce this as a lien on said lot and to have the lot sold to pay the same; and he prays for a sale of this lot to pay this unpaid purchase-money and for general relief. This amended bill was demurred to by the defendants Glynn and Johnson; their demurrer was overruled, and leave given them to file answers within sixty days.

Their answers were filed accordingly. They say the plaintiff sold Glynn the lot for $350.00 in the spring of 1873, and he, Glynn, in full payment for it assigned a land-note for $400.00 executed to Glynn by one George Avington dated November 23, 1872, payable three years after date with interest from date. This was the balance due on the sale by Glynn to Avington of a tract of land in Upshur county, the full price of which was $800.00, and in the deed conveying this land to Avington a lien was on the face of it reserved to secure this unpaid purchase-money. They say that all

of this land-note was collected by the plaintiff, Doonan and, as it was much more than sufficient to pay off the whole of the purchase-money due from him, Glynn, for this lot (No. 77), it was agreed, that the surplus should be applied by the plaintiff in making certain improvements on said lot, and improvements were made by the plaintiff accordingly on this lot, which improvements cost less than $100.00 and were paid for by what the plaintiff collected of Avington on the bond, which Glynn had assigned to the plaintiff after retaining $350.00 the price of this lot, and in cash paid to the plaintiff by Glynn. The title-bond filed with the plaintiffs amended bill obliging him to convey to Glynn lot No. 77 upon the payment of the entire purchase-money ($350.00) acknowledges the receipt of $115.00 thereof. This $100.00 the answers alleged was collected by the plaintiff of Avington on this assigned bond on May 10, 1873, six days before this title-bond was executed, and at the same time the said Glynn executed his note for $250.00 to the plaintiff, the balance of the purchase-money after crediting this $100.00 on the full price, $350.00. Subsequently the plaintiff having collected of Avington the whole of this bond, the said Glynn gave up to him this title-bond but neglected to surrender to him his said bond of $250.00, and the plaintiff executed according to the terms of the title-bond a deed with general warranty of title of this lot (No. 77) the plaintiff having been paid in this manner the full purchase-money, $350.00, which was acknowledged on the face of the deed; that this is the way that the plaintiff got possession of this title-bond, which he makes the foundation for his amended bill pretending, that it was returned to him by Glynn with the understanding, that the contract for the sale was to be annulled by reason partly of the inability of Glynn to pay for the lot and partly by reason of the fact, that Glynn had gotten into some trouble. This the answers allege is all false, and that he got possession of this bond by its being surrendered to him by said Glynn after he had been in this manner paid by collections from Avington not only the full price of the lot but also the full amount, that he had expended on it in building and improvements, and that when he took it up he executed the deed with general warranty of title to said Glynn

acknowledging on its face the payment in full of the purchase-money.   But this deed not having been recorded, long after-wards, on or about July 18, 1883, said Glynn placed it in the custody of the plaintiff for safe-keeping upon his promise to return it, whenever requested to do so by said Glynn; but he has kept it and falsely pretends sometimes, that it has been lost or is in possession of Glynn, as he did in his original bill claiming falsely that a vendor's lien was reserved on its face, and at other times, that no deed has ever been executed, but that this title-bond is the only paper ever executed to Glynn by the plaintiff, and that he got possession of it in the manner pretended in his amended bill; that Glynn took possession of this lot (No. 77) under this purchase in May, 1873, and did not for years learn, that the plaintiff either claimed to have title to it or any lien on it for any unpaid purchase-money; but on January 30, 1882, the plaintiff commenced an action of ejectment against the defendants claiming this lot in fee simple, which action terminated March 27, 1883, by a verdict in favor of the defendants and a judg-ment in their favor by the court.   A copy of the record of this action is filed with the answers and shows, that it is correctly set out in these answers.   They allege, that the only issue really tried in this action of ejectment was the question, whether the plaintiff had ever executed a deed for this lot to said Glynn; and on that issue the jury rendered a verdict for the said Glynn, and the court its judgment; and it is claimed, that the plaintiff is thereby estopped to den the making of this deed by him; and if he made a deed, then of course his amended bill must be dismissed claiming, as it does, an implied lien for the purchase-money, which it pretends to be unpaid, simply because he never executed a deed for said land and holds the legal title thereof.   The answers admit the conveyance by Glynn to defendant, John-son, of the remainder after Glynn's death, which conveyance is alleged to have been made to secure his services as a law-yer in defending Glynn's little home from the rapacity of a greedy and wealthy plaintiff.   The answers were not replied to, but depositions were taken by both the plaintiff and the defendants to establish their respective views of these trans-actions as stated in their pleadings.

Doonan's two depositions show, that his recollection of the transactions between him and Glynn was very vague, and that he had, as he admits, forgotten very much of them; especially was his recollection of the amounts of money and dates very bad. Thus he had evidently forgotten the price, which Glynn had agreed to pay him for this lot, as is shown by the fact, that the price is left blank in his original bill. He had also forgotten the amount of the Avington note, which was transferred to him by Glynn at the time this lot was purchased; for he states it in his original bill as $300.00; while the deed of Glynn to Avington, a copy of which was filed with Glynn's answer to the amended bill, shows, that the principal was $400.00 with interest from November 23, 1870, amounting at the time of the sale of the lot probably in April, 1870, to about $458.00. This note was secured by a vendor's lien on a tract of land of about 200 acres in Upshur county, W. Va., where Avington then lived and now lives. As if to make his first statement of the amount due on this note correspond with this he says, he is now of opinion, that, when he got this note, probably in April, 1873, there was a credit on it, but he has no recollection of its amount or date. It would have required a credit on it of about $158.00 to reduce it to $300.00, the amount which he says he took it for, and he admits, that he took it at its face value, which is no doubt correct, as it was most amply secured, it being the first lien on land worth not less than $800.00, the price Avington paid for it. His opinion, that there was a credit on it, the note in April, 1873, of an amount, which, we must infer from his statement, was some $158.00, must, I should think, be wrong, as this note was not due for six months afterwards. His statement about the amount of the money, which he spent and agreed to spend in building a house on the lot after this verbal sale of it, and the amount, which he spent afterwards in other improvements, which according to his recollection amounted to $195.00 or $200.00, was probably equally erroneous, though he did spend some money on this building and on subsequent improvements on this property. He also paid the taxes on the property for six or seven years, the amount of which is not shown, but it was from 1874 to 1881 and amounted probably to $30.00 or $40.00.

His other statements in his second deposition correspond with those in his first deposition, which have been given hereinbefore.  He states, that he had been a prosperous merchant for more than twenty years, and that Glynn had been a pauper for several years.  He states, that he brought two suits against Glynn before a justice to get possession of this lot.  He claimed in these suits, that as Glynn had surrendered the title-bond, because the officers of the law were after him, and he did not believe, he could keep the property pay for it, and had refused to pay the taxes on it, and had told me, he would give it up, and I might sell it, and I had sold it for $500.00, and he was looking for a house elsewhere, as he told me, I regarded, that he had no longer any title to this lot.  But the justice dismissed one of these suits for some irregularity and the other because the title to the lot was in controversy.  He also brought a suit before this justice against Glynn for the rent of this lot but did not succeed for the same reason.  He then brought the action of ejectment in the circuit court of Taylor county with the result before stated, a verdict against him; and he then brought this suit.

While Glynn in his deposition states these transactions much more emphatically than Doonan, yet it is apparent, his recollection of time especially of amounts and dates is even less to be relied on than Doonan's, as they contradict in many respects his own answer and the documentary evidence, as for instance, he states the price of the lot was $300.00, while it was $350.00; he says, that Doonan was to allow him $300.00 for the Avington note, when he transferred it; this is a mistake, as it is admitted by Doonan, that he was to take it at par, and it was shown that it amounted then to $458.00, and it was a perfectly good note.  He denies ever giving to Doonan the $250.00 note, though he admitted it in his answer, and it was obviously true.  He testifies that the building of the house cost Doonan $65.00, and he was to have spent $25.00 in other improvements, but he never completed them, and he Glynn had to make them, before he could go into the house.  The house was twenty two feet long and sixteen wide built of rough boards unpainted and with no chimney but simply a flue from the rafters upwards.  He

denies, that any title-bond was ever given him, but that, when he transferred the Avington bond to Doonan, having paid all that he owed Doonan for the lot and house and other improvements, Doonan made him a deed for the lot, which was the only paper he ever gave him, and that he returned to him some two years afterwards to keep for him, as he advised him, as the officers were after him, to keep the property for him and save it from the officers.

This deposition of Glynn is evidently entitled to but little weight except where corroborated by the circumstances or by documentary evidence. Its unreliability obviously arises from his gross ignorance; he could not read writing, though he could sign his name; he had been an inmate of the county poor-house for a year, before his deposition was taken.

The defendant Johnson the lawyer, to whom Glynn had conveyed this lot, after reserving a life-interest as a compensation for carrying on this dispute with Doonan, Glynn not being able to do it because of his poverty, testifies, that the only issue tried before the jury in the ejectment cause at the last trial was, whether the legal title to this lot in controversy had been conveyed by Doonan to Glynn; but, he says, on the first trial when the jury was hung, the defendants gave the plaintiff notice, that they would rely on the equitable title to this lot being in Glynn; but at the first trial this defence was not relied on, and Glynn testified, that Doonan had made him a deed for the lot, while Doonan testified, he thought it was a title-bond he had given him, and said he had given it up, and he regarded the contract as annulled between them.

John W. Mason, a lawyer, who was a spectator at this last trial, thinks, that the issue tried before the jury was as to the legal title to this lot. McNemera, Doonan's clerk, proved the execution of the $250.00 bond of date May 10, 1873, by Glynn to Doonan and the execution of the title-bond by Doonan to Glynn; they were written by this witness. He heard Doonan tell Glynn, that if he wished to escape the sheriff, he had better give up the paper. But he did not notice, whether he gave up the title-bond or a deed.

Avington proved, that on May 10, 1873, he paid $115.00 to John Doonan on this $400.00 land-bond dated November

23, 1870, payable three years after date with interest from date, which had been transferred to Doonan by Glynn, and he took Doonan's receipt for this $115.00, which he produced. He has paid off the whole of this $400.00 note, and John Doonan has released his lien on his 200 acres of land, which was a security for his $400.00 note.

On these pleadings and proofs the circuit court by its decree of April 2, 1880, dismissed the plaintiff's amended bill; and he has appealed to this Court.

Opinion by Green, Judge:

It is obvious, that the plaintiff can not have any relief on his amended bill, in which he claims, that there is due him on this lot No. 77 $235.00 and interest since May 1, 1873, for which he gave to defendant Glynn a title-bond, and which bond on its face provides, that he shall execute to Glynn a deed, when the whole purchase-money is paid, if, as Glynn insists, such deed has been executed. For, if this be true, not only are the material allegations of the amended bill unsupported, but the plaintiff can have no cause of action, as the execution of the deed by him would show, that he had been paid all his purchase-money for this lot. Glynn has claimed ever since March 20, 1883, when the jury was sworn in the ejectment-suit brought by Doonan to recover this lot in the circuit court of Taylor, that Doonan had made him a deed for the lot. If this be so, the decree of the circuit court of April 2, 1886, in this cause, dismissing the plaintiff's bill at his costs must be affirmed. The appellees contend, that the appellant, Doonan, is estopped from denying, that he has made such a deed to Glynn by the verdict of the jury in the ejectment suit rendered March 20, 1883, and the judgment of the court thereon; because, they claim, the only issue then tried by the jury and decided by the court was as to the legal title of the lot, which being decided to be in Glynn, Doonan is estopped from claiming, that he never made him a deed. Upon this subject Judge Snyder in delivering the opinion of this Court, when this case was formerly before us says:

"The result of the action of ejectment pleaded in the answer of the defendant Glynn can not operate an estoppel or

bar to this suit.    That action was founded on the assumption that the plaintiff had the legal title to the lot in controversy, and the court decided he had no such title.    This suit admits the result of that suit settled the question that the title was in the defendants, and the plaintiff is now seeking to enforce his lien on the lot as the property of the defendants.    It is true the defendants did not in fact have the legal title to the lot, but they hold as vendees of the plaintiff by a written contract, stating the purchase and the terms thereof, signed by him ; and this contract under our statute is just as effectual to defeat a recovery in ejectment as the possession of the legal title." (Sec. 20, ch. 90 Code, p. 520).

To avoid the effect of these views, when the case was again before the circuit court of Taylor, after it had been remanded to that court, and after the amended bill was filed, the defendants undertook by parol evidence to prove, that the only issue tried by the jury in this ejectment suit, when the jury found a verdict for the defendants, was, whether the legal title to this lot was in the plaintiff, or whether he had by a deed conveyed the legal title to the defendant Glynn, and the jury having found against the plaintiff, he was now estopped from denying, that he had conveyed the legal title of the lot to Glynn.    The defendant, Johnson, by his deposition proved that "on the first trial of this ejectment suit the defendants gave the plaintiff (John Doonan) notice that they would rely on the equitable title to this lot being in Patrick Glynn.    But this defence was not made on the last trial.    Glynn claimed in his evidence on the last trial, that Doonan had made him a deed for this lot.    The only issue tried by the jury under the plea of not guilty was whether the legal title to the lot in controversy had been conveyed by Doonan to Glynn."    This is confirmed by the recollection of Mann, a spectator of this last trial in the ejectment case.    The notice under section 22 of ch. 90 of the Code p. 520, is given by simply filing such notice with the plea of not guilty.    And this notice being so given, under this statute sec. 20 of ch. 90 of Code, p. 520, the defendants could have defeated the plaintiff's action by simply proving, that the plaintiff had executed the title-bond for this lot to Glynn the defendant now relied upon by the

plaintiff as the basis of this chancery suit. This being the case the plaintiff is not estopped from proving, that he never did convey the legal title of the lot No. 77 to Patrick Glynn. The defendants can not prove by parol evidence, that the jury in this ejectment case based their verdict on the proof, that the plaintiff Doonan had conveyed the legal title to the defendant Glynn, and thereby estop him from proving in this cause, that he never did convey to him the legal title to this lot. This has in effect been decided by this Court in *Covelle* v. *Gilman,* 13 W. Va. 327-8, and in *Beckwith* v. *Thompson,* 18 W. Va. 120. The second point of the syllabus in this case is:

"Facts in controversy on the trial of an issue but not necessarily involved in the issue, though ever so important to its determination, are not settled by a judgment on the issue, but are open to controversy in any other suit between the same parties and their privies."

In this case the fact, whether the plaintiff, Doonan, ever made a deed for the lot to the defendant, Glynn, though ever so important in deciding the issue in the ejectment suit, is not settled by the judgment on the issue in that suit, but is open to controversy by these parties and their privies, because this fact, as we have seen, was not necessarily involved in the issue of not guilty. For the verdict would have been the same, had the plaintiff in that case satisfied the jury that he had the legal title, provided he proved, that the defendant, Glynn, had the equitable title, which is proven by this title-bond produced in this cause. The question then, whether Doonan ever delivered a deed for this lot to Glynn, is open to controversy in this cause, just as though it never had been a question of fact disputed in the ejectment suit. In this cause, when it was previously before us, Judge Snyder in delivering the opinion of this Court, 26 W. Va. 228, says: "It is also plain that there never was in fact any deed made by the plaintiff to Glynn for the lot, for by the terms of the title-bond no deed was to be made until the purchase-money should be paid, and the evidence shows this has never been done."

At that time there was no evidence on this question before this Court other than the deposition of the plaintiff, Doonan.

As we shall presently see, the evidence, which he gives, has been overthrown by testimony introduced into the cause, since it was remanded to the circuit court; and the evidence now shows, that all the purchase-money for this lot had probably been paid, and therefore perhaps the *prima facie* presumption might now be, that he had made a deed for this lot to Glynn, as he is required to do so by his title-bond. But this presumption is rebutted first ·by the fact, that it is clear, that Doonan, the plaintiff, has at no time admitted, that all the purchase-money due to him from Glynn on this lot has been paid, that he has claimed, that the legal title to this house was in him by bringing two suits before a justice to recover the possession of the lot, by his bringing a suit before a justice against Glynn for the rent of this lot, and by his bringing this action of ejectment. It is true, that after the verdict of the jury and the judgment of the court against him in the ejectment suit still insisting that all the purchase-money of this lot had not been paid him he did bring this suit and in his original bill admitted, that he had executed a deed conveying the lot to Glynn, but he alleged, that he had reserved on its face a vendor's lien for the unpaid purchase-money, which he sought to enforce. I think, it is clearly proven in this case now, that he never did execute any deed for the lot to Glynn. The only proof, that he ever did, is the testimony of Glynn, who is evidently a very ignorant man and cannot read. It seems to me, that, when this is borne in mind in connection with other facts clearly proven, it is obvious, that Glynn does not know the difference between a title-bond and a deed. In the first place it is clearly and satisfactorily proven, that the title-bond dated May 16, 1873, and filed with the amended bill was executed by Doonan. Glynn himself in his answer drawn by counsel admits, that the title-bond was delivered to him; but in his deposition he insists, that Doonan never delivered to him more than one paper in connection with the sale and title of this lot, and says emphatically that it was not this title-bond but a deed. This seems on its face to be clearly a mistake the result of ignorance on his part; and if there was no other evidence, the inference would be, that this title-bond was delivered to him by Doonan, and that no

deed ever was delivered to him.    That this was the fact, is
also distinctly deposed to by John Doonan the plaintiff.

Is there then any of the purchase-money due from Glynn
to Doonan on this lot still unpaid?    If there is, Doonan in
this suit had a right to enforce its payment by a sale of the
lot under the decree of the circuit court; and the decree dis-
missing his suit must be reversed.    This lot was purchased
verbally by Glynn of Doonan in the spring of 1873, probably
shortly before the first of May.    He transferred to Doonan
as collateral security for its payment, a bond of George Arring-
ton of Upshur county for $400.00 dated November 23, 1870,
payable three years after date with interest from date, which
bond was a land-bond secured by a vendor's lien on a tract of
land of 200 acres in Upshur county, which Patrick Glynn
had sold and conveyed to Arrington.    This tract of land was
worth $800.00, that being the price, which Glynn had sold
it for.    So that this $400.00 bond was amply secured.    It
was therefore worth its face value, then about $458.00.
Which being $108.00 more than the price to be paid for this
lot, $350.00; and the lot having no house on it and no fence
around it, there was an understanding, that Doonan would
fence the lot and build upon it a very small and cheap
building to be twenty feet long and sixteen feet wide and
built of rough plank unpainted and to be unplastered
and to have no chimney but simply a flue.    There is a
great diversity between the statements of Doonan and Glynn
as to how much was to be and was expended by Doonan
in these improvements.    Doonan says according to his recol-
lection it was $160.00, and afterwards, this being insuf-
ficient, it was increased $35.00 or $40.00 in all $195.00 to
$200.00.    But Glynn says the first sum agreed to be so ex-
pended was $65.00, which was afterwards increased $25.00
for improvements making in all $90.00; and that the im-
provements agreed to be put on the ground for this further
sum of $25.00 were not made by Doonan, and he Glynn
had to do them himself to a considerable extent and to build
the fence around the lot.

When we look at the surrounding circumstances, I can but
think, that the real truth lies between these statements, and
that the strong probability is, that the real amount to be

expended, and which was expended by Doonan on this lot and the improvements he put upon it, was about $108.00, the amount, which would be over in his hands belonging to Glynn, when he collected this land-bond of $400.0 and interest, which Avington owed Glynn. I can not think, as Doonan would have us believe, that he would agree to expend or would expend for Glynn on this lot nearly $200.00 or $90.00 more money, than he would ever receive from Avington, for Glynn and take from Glynn no sort of security for it. Yet, if he did spend it, we know he took no sort of security for it, though Glynn was not only a very poor man but a very improvident one (for Doonan himself in his deposition says he had been a pauper for several years, when he testified and for some time he had been an inmate of the Taylor county poor-house). It is not at all probable, that a prosperous man like John Doonan would spend $90.00 of his own money to improve the property of such a man without any security, especially when he had it in his own power without oppressing Glynn to secure it. The title-bond, which Doonan executed on May 16, 1873, agreeing to convey this lot, when all the purchase-money was paid, on its face shows, that the verbal understanding, when this lot was verbally agreed to be sold, perhaps a month before, was, that whatever money, Doonan might collect of Avington, was to be first credited on the $350.00 the price of the lot; for he had received $115.00 of Avington six days before, and this on the face of the title-bond was credited as a part payment on the $350.00 the price of the lot. If it were true, that Doonan was to spend $90.00 on this lot in improving it for Glynn, more than he could ever be repaid by the money, he could get from Avington, would he not have credited this $115.00 on what he had expended or was to expend on Glynn's house, for which he had no security ? This would have made him entirely safe. Nor would this have been oppressive on Glynn, as the whole lien on his property after the expenditure on it by Doonan, some $200.00, would only have been about $90.00. All of the purchase-money as well as all the residue of the costs of the improvements would have been paid out of the Avington note of $400.00 and interest. I can not believe, that Doonan, as he says, spent nearly $200.00 in improving

this lot. If this had been true, he would have secured himself by crediting the $115.00, which he received of Arrington on May 10, 1883, on the money, which he had or would thus expend in these improvements, and would not have credited it on the purchase-money of the lot, which was already perfectly secure, as the title was to be reserved, till it was paid, and he had in addition to this $400.00 bond of Arington as security.

On the other hand I can not credit the statement of Glynn on this subject. I can not see, why Doonan would not be willing to spend $90.00 on this lot, as he would have in his hands after paying himself all, that Glynn owed him, about $108.00 of Glynn's money to be collected of Arrington ; and it seems to me Glynn would naturally insist upon that much being spent by Doonan in improving the lot. Nor can I believe Glynn paid to Doonan $50.00 in cash, if he paid him anything, on these improvements, before they were commenced. If he did so, he ought to produce his receipts for the sum. Doonan says he has no recollection of his paying him anything. He was a very poor man, and it seems unlikely, that he would pay in cash this sum, if he ever had such a sum at one time, to Doonan a provident man, when Doonan had in his hands a bond belonging to him Glynn, on which he could probably in a short time collect enough money to pay for all the improvements, he wanted put on his land. In tact Doonan did collect $115.00 of this money in less probably than a month. I take the truth to be probably, that enough money was to be and was spent by Doonan on this lot to consume with the $350.00 due him all the money he would collect from Arrington, that is about $108.00 and perhaps a little more, which Glynn had paid him in cash. When he spent that, he stopped spending money in improving the lot, though the improvements were still so small, as to make some other expenditures necessary to make the house and lot at all comfortable, and then additional improvements had to be made by Glynn himself in whole or in part. Doonan, it is true, afterwards paid some small amount in taxes on the property during some six or seven years. But he does not even claim, that he has any lien on the lot, which can be enforced in this suit, because of these taxes, which he has paid. It is obvious

he paid them, because he set up a claim to the lot alleging, that by the surrender to him of the title-bond Glynn had annulled the contract for the purchase of the lot, and it belonged to him.

There is in my judgment nothing due to Doonan on the purchase of this lot. It is true he says, that he does not think, he got the whole of this $400.00 bond of Avington to Glynn, as he thinks now, that, when he got this bond, there was a credit upon it; but he does not state either the date or amount of this credit, and it seems highly improbable, that Avington had paid, when Doonan got his bond, anything upon it, as it was not due and did not become due for some seven months afterwards. It is most improbable, that Glynn living in Taylor county ever tried to collect anything of Avington living in Upshur county on this bond, before it was due. It is true Avington did pay $115.00 to Doonan on this bond on May 10, 1883, which was more than six months before it was due. But this was doubtless done to furnish Glynn money, wherewith his house could be built and for his special accomodation under these circumstances. But no occasion is disclosed for Avington advancing money on this bond prior to its transfer to Doonan. Had he done so, he would doubtless have remembered it, and could have proved it just as readily as he did the payment of the $115.00. If he ever did advance any other money to Glynn on this bond I presume, he had his receipt, and could and would have produced it, if asked to do so, just as he produced the receipt of Doonan for the $115.00. It seems to me that was advanced purposely to make these improvements on this lot for Glynn's accommodation, and if more had been spent upon these improvements, Doonan could have proved it by having the value of the improvements estimated, and their value could have been proven readily within a small amount. It seems to me the Avington note, all of which he collected, paid him not only the purchase-money of this lot but also for all these improvements put upon it by him. The $250.00 bond, which he took from Doonan on May 10, 1873, was made up, I presume, of the price of the lot $350.00 and $15.00 which he had spent on the building of this house up to that time after deducting therefrom the $115.00, he had

received for Glynn from Avington that day. This bond for $250.00 ought to have been given up by him to Glynn, when he, Doonan, had collected the whole of the Avington note, which Glynn had transferred to him as collateral security both for the payment of the price of the lot and also as collateral security for the re-payment of the money spent, or which should be spent, by Doonan in improvements on the lot. But this Avington note was not collected by Doonan in full certainly till it was due November 23, 1873, and probably not for some time after that; and Glynn and he never had any settlement after November 23, 1873. Hence this note of Glynn's to Doonan for $250.00 remained in the hands of Doonan and has never been surrendered.

Now these are the views and conclusions, which my mind reaches upon the evidence in this case, much of which is questionable and unsatisfactory, and doubtless it is somewhat conjectural. The conclusion, which I have reached, may be colored in some degree by my own experience and temperament. Had the circuit court reached a different conclusion on this questionable and unsatisfactory evidence colored, as it might have been, by the experience and temperament of the circuit judge, I should have felt myself bound to affirm his decision, as I feel myself now bound to affirm his decision. In *Smith's adm'r.* v. *Yoke et al* 27 W. Va. 639, this Court in point 1 of syll. lays down the law as follows:

"When the decree sought to be reversed is based upon depositions which are conflicting and of such a doubtful and unsatisfactory character, that different minds and different judges might reasonably disagree as to the facts proved by them, or the proper conclusions to be deduced therefrom, the Appellee Court will decline to reverse the finding or decree of the chancellor, although the testimony may be such that the Appellate Court might have pronounced a different decree if it had acted upon the cause in the first instance."

The evidence in this cause is certainly of this conflicting character and is of such a doubtful and unsatisfactory character, that different minds might reasonably disagree as to the facts proven, and therefore, even had I differed from the conclusion reached by the circuit judge, I ought to affirm his decree.

For these reasons the decree of the circuit court of April 2, 1886, dismissing the plaintiff and decreeing the costs against him must be affirmed; and the appellees must recover of the appellant their costs in this Court expended and $30.00 damages.

AFFIRMED.