# CHARLESTON.

BARTLETT v. CLEAVENGER, *et al.*

Submitted September 5, 1891.—Decided December 19, 1891.

1. FRAUDULENT CONVEYANCES—CONFIDENTIAL RELATIONS—EVIDENCE—REVIEW.

Where a party, who is insolvent by reason of indebtedness contracted on his individual account and as security, conveys all of his property to his two brothers for a pretended consideration made up partly of an old debt, which he had owed one of the brothers for years, and partly by their assumption of certain debts of his on which they are already liable as his surety, and after the execution of the deed of conveyance said party remains in possession of the land conveyed, using and occupying the same as he had formerly done, renting portions of the land, and receiving the rents therefor, and the grantees are fully cognizant of the financial embarrassment under which their grantor is laboring, these circumstances have a strong tendency to show that the transaction was fraudulent as to the creditors of said grantor, and the burden would be upon the grantees to prove the payment of the purchase-money, or, if the deed was executed in payment of existing debts, to prove the existence and validity of such debts.

2. FRAUDULENT CONVEYANCES—EVIDENCE.

In showing the fraud necessary to impeach a conveyance, the fraudulent intent of the parties may be shown by the circumstances attending the transaction. Circumstantial evidence is not only sufficient, but is often the only evidence that can be adduced.

3. REVERSAL—EVIDENCE.

Where the decree complained of is based upon depositions which are conflicting and contradictory in their character, so that it is difficult to determine on which side they preponderate, and hard to draw a proper conclusion therefrom, and different judges might reasonably disagree as to the facts proved, the appellate court will refuse to reverse the decree of the court below, although the testimony may be such that the appellate court might have rendered a different decree if it had acted upon the case in the first instance.

4. FRAUDULENT CONVEYANCES.

A case in which the facts proven were sufficient to show an intention on the part of both grantor and grantees to hinder, delay and defraud the creditors of the grantor.

*W. T. Ice* and *C. F. Teter* for appellants, cited 85 Va. 955; 22 W. Va. 356; Kerr Frauds 382; 2 Munf. 310; 17 W. Va. 717; 10 W. Va. 87.

*J. H.* Woods for appellees, cited 23 W. Va. 644; 29 W. Va. 441; 32 W. Va. 303; 27 W. Va. 639; 28 W. Va. 715; 31 W. Va. 137; 33 W. Va. 159; Waite Fraud. Conv. (1889) § 281; 17 W. Va. 717; 22 W. Va. 357; Waite Fraud. Conv. §§ 239-243; Code, c. 74, s. 1; 3 Gratt. 34, 58; Waite Fraud. Conv. § 279; 104 Ind. 495, 498; Waite Fraud. Conv. § 192; Code, c. 135, s. 27.

ENGLISH, JUDGE:

At the September rules in the year 1888 Josiah Bartlett filed his bill in the Circuit Court of Barbour county against Geo. G. Cleavenger, Chasteen Cleavenger, Zadock Cleavenger, and C. G. Cleavenger, in which he alleged that on the 13th day of August, 1888, he recovered a judgment before a justice of said county for two hundred and twenty four dollars and thirty cents, with interest from that day, and three dollars and ten cents costs, against George G. and C. G. Cleavenger, on a note executed by said George G. Cleavenger with C. G. Cleavenger as surety; that at the

time said note was executed the defendant George G. Cleavenger was the owner of a very valuable tract of land lying in said county, containing one hundred and seventy eight acres, but that on the 27th day of October, 1885, he, by deed of that date, conveyed the same to the defendants Chasteen and Zadock Cleavenger for the pretended consideration of four thousand and five dollars; and plaintiff charged that said deed was executed for the purpose of delaying, defrauding, and hindering the creditors of the said George G., and especially the plaintiff, in the collection of their debts; that said George G., Chasteen and Zadock Cleavenger are brothers, and were all participants in said fraud; that no valuable consideration was paid for said land, and that plaintiff had the right to have said deed set aside, and said land sold and his debt paid out of the proceeds; and that to deny him relief in the premises would be to his great wrong and injury. All of which is contrary to equity, and he prayed that said deed might be set aside, and said land sold and the plaintiff's judgment might be paid out of the proceeds of such sale, *etc.*

On the 7th day of March, 1889, the defendants, Chasteen and Zadock Cleavenger, filed separate answers to the plaintiff's bill, disclaiming any knowledge or notice of plaintiff's judgment other than that derived from the certified copy thereof filed with plaintiff's bill, admitting the purchase of the one hundred and seventy eight-acre tract of land mentioned in the plaintiff's bill on the 27th day of October, 1885, for the sum of four thousand and five dollars; denying that said consideration was a pretended consideration, or that said deed was executed for the purpose of delaying, defrauding and hindering the creditors of the defendant George C. Cleavenger, and especially the plaintiff, in the collection of their debts—the said Chasteen Cleavenger, in his answer, claiming that the purchase of said tract of land was a perfectly fair, honorable business transaction, and the consideration mentioned in said deed was in fact paid to the last farthing; that he and his brother purchased said land jointly; that he assumed the payment of and paid off certain debts owing by said George G. to one Humphrey McDonald of five hundred dollars,

and other debts owed by said George G. to various parties to the sum of two hundred and seventy two dollars and seventy three cents, aggregating seven hundred and seventy two dollars and seventy three cents ; and that he paid to said George G. Cleavenger, on the day said deed was executed, the sum of one thousand two hundred and twenty nine dollars and seventy seven cents, making a total of two thousand and two dollars and fifty cents paid to said George G. for respondent's share of said land ; and that Zadock Cleavenger assumed the payment and in fact paid a note executed by said George G. to one Thomas Bailey for six hundred and seventy two dollars, and paid in cash to said George G. at the time of the execution of said deed one thousand three hundred and thirty dollars and fifty cents, aggregating two thousand, two dollars and fifty cents, the amount paid by Zadock for his share of said land, so that every dollar was paid for said land, and was a valuable consideration therefor, and in fact all that said land was worth ; that he knew nothing of the existence of plaintiff's debt at the time of the purchase of said land, or until long thereafter, and that it would be doing him great injustice to set aside his deed to said land after having paid therefor its full value, and having the peaceable possession thereof for nearly four years ; that he purchased said land in good faith, without any intention of hindering the creditors of the defendant George G. Cleavenger from the collection of any debts he might be owing, *etc.*

The defendant Zadock Cleavenger also claimed that said purchase was a square business transaction, and his statement of the manner in which he paid two thousand, two dollars and fifty cents—his half of said purchase-money— corresponds with the statement contained in the answer of his co-defendant Chasteen Cleavenger. He also disclaims any knowledge of the existence of the plaintiff's debt, and claims that he purchased said land in good faith, with no intention of delaying, defrauding, or hindering the creditors of said George G. or the plaintiff in the collection of their debts. He admits that he, George G., and Chasteen are brothers, but claims that he is prepared to show the truth of every allegation contained in his answer.

To these answers the plaintiff replied generally.

George G. Cleavenger also answered the plaintiff's bill, admitting the recovery of the judgment by himself as set forth in the bill, and the sale and conveyance of said one hundred and seventy eight-acre tract of land to his co-defendants, Chasteen and Zadock Cleavenger, at the price of four thousand and five dollars, on the 27th of October, 1885; denying that said sum was a pretended consideration which was not paid in fact, or that said deed was made with the intention or purpose of hindering, delaying and defrauding the creditors of respondent, and especially the plaintiff, in the collection of their debts against respondent; claiming that the sale was *bona fide,* and that the purchase-money was paid to him by said purchasers in the manner and at the time stated in their answers; that said sale was a fair, square business transaction, and that he used nearly all of the purchase-money received by him from said purchasers in liquidating his debts to various parties.

On the 10th day of September, 1889, the First National Bank of Grafton filed its petition in said chancery cause, representing that it was a creditor of the said George G. Cleavenger; that on the 16th day of June, 1885, he, together with F. A. Cleavenger and M. S. Cleavenger, executed a note for one thousand five hundred dollars, dated the day and year aforesaid, and payable six months thereafter to the plaintiff; that it recovered a judgment in the Circuit Court of Taylor county on the 26th day of March, 1887, against said F. A., George G., and M. S. Cleavenger for the sum of one thousand six hundred and twenty three dollars, with interest from that date and twenty one dollars and twenty six cents costs, and that the same remains wholly unpaid; that the same was docketed in the clerk's office of the county court of Barbour county on the 7th day of April, 1887, as provided by law.

Said petitioner further alleges that said George G. Cleavenger was, on the 27th day of October, 1885, the owner of a valuable farm lying in said county, worth twenty five or thirty dollars per acre, upon the faith of which the said debt was created by petitioner; that on that day the said George C. Cleavenger, for the purpose of defrauding, hin-

dering, and delaying the plaintiff, petitioner, and other persons in the collection of their debts against him, of all of which purpose the grantees, Chasteen Cleavenger and Zadock Cleavenger, had full and perfect notice, conveyed to them the said land for the alleged price of four thousand and five dollars.

Petitioner further says that it is informed and believes and charges as true that the said sale was a fraud; that no such consideration, nor any adequate consideration, was paid for said land; that the grantor and grantees are brothers; that the grantees knew that the grantor was in debt to petitioner and others; that the said indebtedness could only be paid by a sale of said land; that, if any of said pretended four thousand and five dollars was paid by the grantees to said George G. Cleavenger, the same was repaid to them by him, or with their connivance; or it was agreed between the grantor and them that the same should be repaid without consideration, and with the fraudulent purpose aforesaid; that no change in the possession of said land occurred after the said purchase, but that said George G. Cleavenger remains still on the same as he has done for many years, using the same as his own; that the said grantees were not able to purchase the said land, being themselves involved for one Abram M. Talbott, who had become insolvent about one year before; that the said F. A. Cleavenger and M. S. Cleavenger are utterly insolvent, and petitioner relied for the security of said debt principally upon the said real estate of said George G. Cleavenger; that the same was all he had or has; that said grantees well knew it;. and that the whole pretended sale was a scheme and device to cheat petitioner, plaintiff, and others out of their debts; and, to the end that petitioner may be relieved without a multiplicity of suits, it prays to be made a co-plaintiff with said Josiah Bartlett, that the said deed may be set aside as fraudulent and void as to its said debt, and the land be sold to pay the same *etc.*

On the 11th day of September, 1888, Floyd Davison filed his petition in said cause, representing that in the year 1885, previous to the 27th day of October, he became

the surety of Flavius A. Cleavenger to the First National Bank of Grafton for five hundred dollars, and George G. Cleavenger became his co-surety, and when the said note became due petitioner was obliged to pay, and on the 29th day of December, 1885, he did pay, to the said Grafton bank the said note, which was well known to the said George G. Cleavenger; that on the 13th day of March, 1886, he recovered a judgment in said court against him, the said George G. Cleavenger, for two hundred and five dollars, with interest thereon, and thirteen dollars and seventeen cents costs, which remains wholly unpaid, which judgment was duly docketed in the judgment-lien docket of said county on the 30th day of March, 1886; that at the time said note was executed the said George G. Cleavenger was the owner of a valuable farm, situated on Simpson's creek, in said county, containing one hundred and seventy eight acres, which was in the highest state of cultivation, and in fine order, and worth at that time five thousand dollars, as well as the owner of valuable personal property, consisting of horses, cattle, sheep, money, notes, and securities, and at that time no judgments had been recovered against him. He then proceeds to state the sale of said land by said George G. to Chasteen and Zadock Cleavenger, making, in substance, the same allegations that are made in the petition filed by said First National Bank as to the fraudulent intention of said parties in making said conveyance; also alleging that he sold or pretended to sell all of his personal property to his said brothers and other persons with like intent, and then became insolvent, and has so continued; that the pretended consideration of four thousand and five dollars was never in fact paid or intended to be paid, but that the whole transaction was a fraudulent shift and device between the said George G. and his said brothers to place his whole estate beyond the reach of his creditors for the present time, with the intent to restore the said land either to the said George G. Cleavenger or his children at such future time as he might think best to require it; that at the time said pretended conveyance was made neither said Zadock nor Chasteen Cleavenger had such sum of money as four thousand and five dol-

lars; that they were about that time heavily in debt on their own account, and also as sureties for other persons; that there has never been any change in the possession of said land since said pretended conveyance was made, but that George G. Cleavenger has continued to reside thereon and farm the same since the year 1885, as he did before the pretended sale to his brothers; and has pastured such stock thereon as he has been able to hold under the pretended ownership of his said brothers, who have allowed him to use their name for that purpose; and he prays to be made a defendant to said bill, and his petition be allowed to stand as an answer thereto, and that said pretended deed dated October 27, 1885, may be declared fraudulent as to his said judgment of two hundred and five dollars, with interest and costs, and that the same may be ascertained to be a lien upon said land from the filing of said petition *etc.*

Poling, Davison & Co. also came in by way of petition asserting a judgment in their favor against said George G. Cleavenger for fifty eight dollars and forty five cents and two dollars and seventy cents costs, making similar allegations as to said conveyance made by George G. Cleavenger to his brothers of said one hundred and seventy eight acres of land, asking that their petition might be filed in said chancery suit, that said land might be sold, and their debt paid.

W. F. Lough also filed a petition in said cause, charging said conveyance to be fraudulent; claiming that he holds a note for fifty dollars, dated February 1, 1890, which was executed to him by said George G. Cleavenger, and remains unpaid; charging that said sale was a sham and a fraud, of which his brothers had notice; asking that said deed might be set aside, and that the note which he filed might be charged as a lien on said land. He makes the same allegations as to fraud as are contained in the bill, asks that his petition may stand as an answer thereto, and says he believes the allegations of the bill are true.

Depositions were taken and filed by both the plaintiff and defendants in the cause. On the 14th day of November, 1890, the case of *Josiah Bartlett* v. *George G. Cleavenger et al.*, *First National Bank* v. *Same etc.*, on petition *W. F.*

*Lough* v. *Same etc.*, on petition, *Floyd, Davison & Co.* v. *Same etc.*, upon petition, *Poling, Davison & Co.* v. *Same, etc.*, upon petition, were heard together, and the court decreed said deed to be fraudulent and void as to said debts set forth in said bill and petitions, and set the same aside, and held said one hundred and seventy eight acres of land liable for the payment of said debts, ascertained the amounts of said debts and their priorities, and directed that, unless the same were paid to the parties entitled thereto, together with the costs of their respective suits and petitions, within thirty days from the date of said decree, the special commissioners therein appointed should advertise and sell the same as therein provided, after giving the bond therein directed; and from this decree said Chasteen and Zadock Cleavenger appealed to this Court.

The appellants assign as error the action of the court below in setting aside said deed, and, in order that we may arrive at a correct conclusion upon the questions raised by this assignment of error, we must look at the circumstances disclosed by the record as surrounding the parties at the time said conveyance was made by the defendant George G. Cleavenger to his brothers, Chasteen and Zadock.

The evidence shows that George G. Cleavenger was indebted to insolvency when said deed was made. Chasteen Cleavenger states in his deposition that he purchased the half of said land from his brother George, and was to pay for same two thousand and two dollars and fifty cents; that he did pay him one thousand, two hundred and twenty nine dollars and seventy seven cents in cash, and assumed the payment of a note for five hundred dollars to Humphrey McDaniel; that the note was for one thousand dollars, and he was surety for M. S. Cleavenger and George G. Cleavenger, and he assumed to pay George's share, five hundred dollars, and that George G. owed him two hundred and seventy two dollars and seventy three cents; and when asked on cross-examination what said George Cleavenger owed him two hundred and seventy two dollars and seventy three cents for, he answered that some years before that he had let him have a couple of colts and some sheep. How many years this debt had been in existence he does not

state, but passes it over with the statement that it was some years before.

It is a significant fact that Chasteen and Zadock Cleavenger, although they are shown to be largely indebted on their own account, and have been living by the side of their brother George for years, suddenly conclude to purchase his farm, although they are largely indebted themselves, and are compelled to borrow a large part of the money with which to make the purchase. They did not need the farm, for the evidence shows that they allowed George G. to remain in possession and cultivate and use the land as he had been doing for years before. Chasteen says that he thereby collected an old debt of two hundred and seventy two dollars and seventy three cents from George, which he had owed him for years for some colts and sheep, and he assumed a debt of five hundred dollars to Humphrey McDaniel; but the evidence also shows that he was already liable for said note, as surety for M. S. and George G. Cleavenger.

According to his own statement, by the payment of one thousand, two hundred and twenty nine dollars and seventy seven cents in cash, he became the owner of one half of said one hundred and seventy eight acres of land, collected a very doubtful debt of two hundred and seventy two dollars and seventy seven cents from his brother George, and assumed the payment of five hundred dollars that he was already liable for; and, when asked from what source he derived the money with which he made the cash payment, he stated that he had sold cattle for it, some about the 1st of October and some about the middle of the same month; that he had sold some to a Benjamin Fleming, some to Sam Phares, and some to a man he could not recall the name of; but William Corder, when placed on the witness stand, testified that Chasteen Cleavenger did not sell his cattle to Sam Phares until after the 1st of November, and his impression was it was about the 19th of November, 1885; and Sam Phares states that it was between the 10th day of November and the 4th of December, 1885, and that he had not paid for these cattle before that time—so that said Chasteen was at least mistaken as to the source from which

he derived the cash, or a part of it, that he claims to have paid on said land, as he purchased the land, and paid the cash, according to his statement, on the 27th of October—fifteen days, at least, before said cattle were sold. Chasteen Cleavenger also claims that he borrowed part of the money with which he made said cash payment; and Thomas N. Curry, a witness in the cause, states that he borrowed from him three hundred and fifty dollars just before the purchase of said land, saying that he was having some trouble, and had to raise so much money by a certain time, and that he would tell him some time what he wanted it for; that the three hundred and fifty dollars was not all the money he wanted; and the witness also stated that said money was paid back to him right after the sale.

Simon Johnson, another witness, states that Zadock Cleavenger borrowed three hundred and fifty dollars from him about the last of October, 1885 ; that he borrowed it on Thursday, and returned it on the Saturday evening following. Lemuel Marks, another witness, states that he had a conversation with Chasteen Cleavenger during the summer of 1885, who told him that he had loaned A. M. Talbott one thousand, five hundred dollars, and that he was on some paper with him to Tom Bailey, and that it would take his loose property to pay the money he was on for said Talbott.

These circumstances indicate clearly the pecuniary condition of Chasteen and Zadock Cleavenger about the time of the purchase of this farm from their brother George. They were living on adjoining farms, and the evidence shows that they were intimately connected in business transactions, and were in the habit of indorsing and going security for each other when it became necessary to raise money to meet the wants of their respective business undertakings; and it would be fair to presume that they were fully acquainted with the financial condition of each other, if it did not appear affirmatively in the evidence that they were so acquainted, as it does.

Then we have the declaration of the parties themselves, as shown by the testimony of C. G. Cleavenger, who states that Chasteen told him that George had put his property

to him and his brother Zadock, and when he replied he was expecting to hear that, for George had told him that he had to do something of that kind, he said, "Then you know all about it;" then he said, "It is not his intention of defrauding any of his creditors," but said it was to keep from paying any of this security money *etc.;* "that he would spend the last dollar he had before he would see George Cleavenger's land sold for his security debts;" and, when asked how he intended to manage it, whether he thought George would ever be able to own it any more or not, or use it in his name any more, he said these notes that there was no judgment taken on would die out some time, and these that were he might buy in at a reduced price, and his own debts he would work on and pay, and the land might go back in his own name, and, if that should not be the case, he could fix it so his children could get the benefit of it—that is, George Cleavenger's children—*etc;* and that it was so arranged that, if all three of the parties should die, George's children would get either the money or the land.

Said witness also states that about a week after this "Zadock Cleavenger asked him if he had heard the news, and he replied to him he didn't know whether he had or not. Zadock then said that people said he had purchased a farm, and, if he had, it was the cheapest one that ever he had purchased; that it had not cost him a five-cent piece, or that he did not suppose it ever would."

Again, Minor S. Cleavenger deposes to a conversation had with Chasteen Cleavenger on his stable lot, one or two days after this transaction took place, in which he says : "He told me that he and Zadock had purchased George G. Cleavenger's land ; and he also stated he would not have done so, but George G. was badly involved by his own debts, and also security debts ; that he was bound to make some arrangement, or his land would be taken away from him for his own debts and security debts ; and this was not done for the purpose of defrauding the people out of George's own debts, but for George to pay his security debts and keep the land, he could not do it."

Eppa L. Bartlett, another witness, swears to a conversa-

tion had with George G. Cleavenger in December, 1886, shortly after he made an assignment, in which said George G. asked him why he did not do like he did, and save a home for his children? And, while it is true that Chasteen and Zadock Cleavenger squarely contradicted the statements made by these witnesses by their own testimony, yet where the evidence is conflicting in a chancery cause, so that it is difficult to determine on which side the weight of the evidence preponderates, this Court has established the rule to defer to the finding of the Circuit Court, which is presumed to have a better opportunity of determining the credibility of the witnesses and the preponderance of the testimony.

So in the case of *Smith* v. *Yoke*, 27 W.Va. 639, this Court held that, "where the decree sought to be reversed is based upon depositions which are so conflicting and of such a doubtful and unsatisfactory character that different minds and different judges might reasonably disagree as to the facts proved by them or the proper conclusion to be deduced therefrom, the appellate court will decline to reverse the finding or the decree of the chancellor, although the testimony may be such that the appellate court might have pronounced a different decree if it had acted on the cause in the first instance." See also *Doonan* v. *Glynn*, 28 W. Va. 715; also, *Prichard* v. *Evans*, 31 W. Va. 137 (5 S. E. Rep. 461).

The court below, in the case at bar, after weighing and considering the evidence adduced by both parties, has seen proper to fix the seal of condemnation upon this transaction, and pronounce the deed of George G. Cleavenger to Chasteen and Zadock Cleavenger, dated October 12, 1885, conveying said one hundred and seventy eight acres of land, fraudulent and void as to the debts set forth in said bill and petitions; and under the rulings in the cases above referred to, in consideration of the character of the testimony, this Court would decline to reverse said decree. Yet, if the court below had seen proper to find otherwise than it did, I am of opinion that there are circumstances and *indicia* of fraud shown by the evidence that point so directly and clearly towards an intention on the part of

these three brothers to hinder, delay and defraud their creditors, that this Court might have been well warranted in reversing the decree of the Circuit Court if. it had held the reverse of what it did.

Among these I may mention the fact that possession of said tract of land was retained by the grantor after said pretended sale was made; not only so, but he actually rented out portions of said tract, and received the rent therefor, as shown by the deposition of Baily Jenkins, who rented a portion of the land, and paid his rent in a share of the crop to George G. Cleavenger.; and by John C. Cleavenger, who deposed that George G. Cleavenger lived on the place just as he always did, so far as he knew; and Minor S. Cleavenger states that George G: Cleavenger lives on the land, plows and raises corn, and mows the meadows the same as he always did *etc.*

In Waite, Fraud. Conv. § 248, the author, after discussing the question at some length, says: "The prevalent policy is to consider the absence of a change of possession as *prima facie* or presumptive evidence of fraud; citing *Crawford* v. *Kirksey*, 55 Ala. 300; *Mayer* v. *Clark*, 40 Ala. 259 *etc.*

There can be no question that, where an insolvent debtor conveys all of his real estate to his brothers, and claims that the consideration was partly paid in old debts which the grantor owed said brother and partly by the assumption of debts on which said brothers were surety for the grantor, and retains possession of said land, farming it as his own, these circumstances should be given considerable weight in determining the *bona fides* of the transaction, and the burden would be upon the grantees to prove the payment of purchase-money.

Another circumstance which is proven by the deposition of Patrick F. Bartlett is that said Bartlett and Claggert Cleavenger, in the fall of 1885, told George G. Cleavenger that they would buy said land, but would not buy it on any other terms than to assume his liabilities, and apply the purchase-money on them until his debts were all assumed, and that they offered him twenty five or thirty dollars per acre. This was in August or September, shortly before he

sold to his brothers; and, although said George G. said that was all he wanted, he was careful not to sell to them at that price, but shortly afterwards sold to his brothers for twenty two dollars and fifty cents per acre, without applying the proceeds to the payment of his liabilities; and the fact that the price of twenty five or thirty dollars was offered to him by these parties is uncontradicted by George G. Cleavenger, although he was subsequently examined, and had ample opportunity of doing so. Minor S. Cleavenger also testifies that he had a conversation with George G., who told him he was going to arrange his land in the hands of Chasteen and Zadock Cleavenger, and that he was on his way to town to make the arrangement; and Al Cleavenger swears that he "had a conversation with George G. at Wood's office, in which he said that he and Minor S. Cleavenger had had some confidential talk, and now to think that he would come up here and act the way he had, it was too much for him to bear."

Minor S. Cleavenger also swears that Chasteen Cleavenger told him that they had to estimate the land at something, and had estimated it at twenty two dollars and fifty cents per acre, and that he had a hard time to raise the money to make this arrangement, for he was afraid to call on some parties for money such a short time that they would suspicion that he was calling for the money for such a short time that they might see that he was holding George's land under false pretense.

And, although Chasteen contradicts this evidence in his deposition, the evidence of T. N. Curry shows that Chasteen Cleavenger borrowed three hundred and fifty dollars from him just before said sale, and paid it back right after the sale; and that Chasteen told him he was having some trouble, and had to raise so much money against a certain time, and that he would tell him some time what he wanted it for; that that was not all the money he wanted; that he wanted more.

Simon Johnson swears that Zadock Cleavenger, about the same time, borrowed three hundred and fifty dollars from him on Thursday and paid it back on Saturday. They both seem to have borrowed money about the time of this transaction and returned it shortly afterwards.

Several witnesses in the cause speak of the large amount of money lost by Chasteen and Zadock Cleavenger by reason of the failure of Talbott, their brother-in-law; and the fact that they allowed George G. to remain in possession of said land after said pretended sale shows that they did not buy the property because they wanted to use it, and their financial condition does not appear to have been such as to warrant them in purchasing the land and allowing said George G. to use it without paying them rent.

These are some of the circumstances disclosed in this record which have a strong tendency to support the correctness of the decree complained of, viewed in the light of the rulings of this Court in the case of *Knight* v. *Capito*, 23 W. Va. 639, where it is held that, "if an insolvent grantor, justly indebted to one of his creditors in a comparatively small amount, convey to him all of his property, or the greater portion thereof, in satisfaction of his debt, for a nominal consideration, falsely recited in the deed, and claimed by the gaantee to have been in hand paid, equal in value to that of the property conveyed, but largely in excess of the debt actually due such creditor, and he accepts the same, such deed, as to the other creditors of the grantor will be held to be fraudulent and void, as the necessary effect of such deed is to hinder, delay and defraud such other creditors; and the grantor and grantee will be held to have intended the necessary result of their wrongful act."

In the case of *Goshorn's Ex'r* v. *Snodgrass*, 17 W. Va. 717 (p't 4 of syllabus) it is held that "a deduction of fraud may be made not only from deceptive assertions and false representations, but from facts, incidents and circumstances which may be trivial in themselves, but may, in a given case be often decisive of a fraudulent design;" and in p't 5, "although a deed be made for a valuable and adequate consideration, yet, if the intent of the grantor with which it is made be dishonest or unlawful, the deed will be deemed fraudulent if the grantee had notice of such intent."

In *Harden* v. *Wagner*, 22 W. Va. 357 (fifth p't of syllabus) it is held that, "if such conveyance be actually fraudulent and the intent concurred in by grantee as well as the grantor, it will be void as to creditors, however valuable

may have been the consideration paid by or secured to the grantee or beneficiary."

Applying these principles to the facts and circumstances disclosed in the record, our conclusion is that there is no error in the decree complained of, and the same must be affirmed with costs and damages to the appellee.

AFFIRMED.