## CHARLESTON.

*Hutton* v. *Dewing et al.*

Submitted September 9, 1896—Decided December 9, 1896.

CONTRACT—KNOWLEDGE OF FRAUD—ESTOPPEL—WAIVER.

If one, with knowledge of a fraud which would relieve him from a contract, goes on to execute it, he thereby confirms it, and can not get relief against it. He has but one election to confirm or repudiate the contract, and, if he elects to confirm it, he is finally bound by it.

JOHN W. MASON, L. D. STRADER and BUTCHER & HARDING for appellants, cited 37 W. Va. 26; 8 W. Va. 292; Const. Art. VIII, s. 5; 40 W. Va. 521; 3 Add. Cont. Append. p. 23, note 13, p. 24; 1 W. Va. 109, syl. pt. 2, 115; Am. Dig. (1890) p. 3101, par. 91, 92; 1 Add. Cont. 87-89; 2 W. Va. 458; Bates, Part. §§ 303-4-5-8-9-15-16-22-23-24; 1 Sto. Eq. Jur. §§ 307-8-15 16-23; 2 Add. Cont. 778-9; Sto. Ag. §§ 210, 211; 138 U. S. 380; 129 U. S. 663; 79 Va. 158; 25 Gratt. 40; 21 W. Va. 617; 17 Am. & Eng. Enc. Law, 1054-5-6; 1 Id. 372, 373; 3 W. Va. 183; 1 Am. & Eng. Enc. Law, 375-6-7-8-9-80-81, 417-18, 425, 429.

W. T. Ice and E. D. Talbott for appellees, cited 23 Gratt. 383; 22 W. Va. 70; 22 Gratt. 649; 90 Va. 711; 33 W. Va. 553.

Brannon, Judge:

This is a chancery suit by Elihu Hutton against Dewing & Sons in the Circuit Court of Randolph county.

The claim of Hutton is that A. H. Winchester and himself, in August, 1885, formed a partnership by verbal agreement for the purpose of purchasing timber lands on Gauley river and its tributaries, and selling them at a profit; that Hutton, who lived not far from that section, and was well acquainted with its people and land, was to examine the lands, find the owners, and enter into contracts or options for their purchase, while Winchester was to look up purchasers for the lands, and sell them at not less than two dollars per acre, but more, if possible; that Hutton was to furnish what cash should be required for purchasing through Winchester out of Hutton's earnings or profits in another enterprise in which they had before been engaged in buying land on Cheat river; that they were to share profits equally; that later B. L. Butcher, a lawyer, was taken into the partnership, so that the enterprise might have his services in examining and securing good titles, and the three were to share profits by thirds; that in pursuance of this enterprise some fifty odd thousand acres of land were contracted for by executory contracts or options, under which ten *per cent.* was to be paid cash, the balance of purchase money deferred, at an average price of one dollar per acre; that in February, 1887, Winchester made a contract by which Butcher disposed of his interest in the lands to Winchester and Hutton upon indefinite terms, fixing no price, and Butcher had never received what was due him; that about the same time Winchester informed Hutton that he had sold, or was about to sell, all said lands to Dewing & Sons at two dollars per acre, and that Hutton protested against such sale, but Winchester claimed the right, under the terms of the agreement of co-partnership, to do so, and virtually compelled Hutton to acquiesce in the sale; that all the while, at the date of this sale, and up to May, 1889,

Hutton rested under the confident belief that Winchester was his partner, whereas, in truth and fact, he was all this while the paid agent of Dewing & Sons, appointed and under duty to look up and purchase lands for them at lowest terms for their advantage and gain, and, instead of subserving the true interests of the partnership in zealously seeking purchasers for said lands at fair, profiting prices, he had used the power of sale given him by the agreement of partnership to enforce a sale to Dewing & Sons of these valuable lands at a price greatly below their true market value, to the injury and loss of Hutton.

The bill asked that the sale to Dewing & Sons be canceled, the land sold for the benefit of the firm, and the firm accounts settled. Butcher was made a defendant, and he filed an answer, giving the same version as Hutton's bill, and as affirmative relief prayed the same relief as Hutton, and that he be given a share in the proceeds of the lands. A decree denied all relief to Hutton and Butcher, and Hutton appealed.

It is claimed that, as Dewing & Sons were aware of the arrangement between Winchester, their agent to buy lands, and Hutton and Butcher, and assented to it, Dewing & Sons, not Winchester, were partners with Hutton and Butcher, and that equity will so treat them. I suppose the basis of relief on this theory would be that the partners in this sale dealt on equal terms, Hutton and Butcher not knowing Dewing & Sons were their partners, but supposing Winchester was selling to a stranger under authority to sell, with or without their assent, given him by the terms of partnership; whereas, if they had known the truth, they need not and would not have consented to the sale; and that thus it is the case of a purchase by one partner of the interest of another in the social assets at undervalue in ignorance of a material fact, which he had a right to know, but which was hidden either by the partner purchasing, or by his agent to accomplish the purchase, or by both, and that equity would cancel the sale and hold the property for the benefit of all the partners. But, if the theory of partnership be not tenable, then another theory would be that at any rate Winchester was agent of

Dewing & Sons to buy lands, and with their knowledge and consent entered into the arrangement with Hutton and Butcher under which the lands were acquired, and then sold to Dewing & Sons at undervalue, claiming to act under rightful power of sale given him by the terms of partnership, which he might use, if he thought best, for his own sole interest, if he wished; and claiming that such sale was well meant by him, as the best he could do for the common interest, whereas he was not in fact acting, as his duty as a partner demanded, for the firm's interest, and selling to a stranger for the market value, but was acting under a duty to Dewing & Sons as their agent, demanding of him to get the land for a low price, though it did injure Hutton and Butcher, they ignorant of the important fact that throughout, and even in the sale, he was acting as agent for Dewing & Sons, and ignorant, by reason of the suppression of that fact; and that whether it was suppressed and hidden from them with or without the knowledge of Dewing & Sons, suppressed it was by their agent, and they would be chargeable with it under the law of agency. *Gregory's Adm'r* v. *Railroad Co.* 37 W. Va. 606, 614 (16 S. E. 819). It is useless to discuss these two theories of the accountability of Dewing & Sons, as, if tenable, in fact or law, they conduct to one result, the cancellation of the conveyance of the land to Dewing & Sons, and holding it for the common benefit of Dewing & Sons, Hutton and Butcher.

Assuming such accountability of Dewing & Sons, yet, if Hutton and Butcher were advised of the fact that Winchester was but the agent of Dewing & Sons, then plainly they can not get relief, for it is the suppression of that fact which they say led them to do what, had they known of it, they would not have done, that is, sell to Dewing & Sons. Then, did they know of this fact at the date of the sale or its consummation? We must look at a good many circumstances to reach what we can not say is an absolute certainty, but a fair and reasonable probability, which in many instances is all that can be done. This is a signal instance, along with its brother enterprise on Cheat river, of a large business, involving several hundred thousand dollars, carried on in a loose, irregular, uncertain manner,

without writings, left largely to frail memory, and involved in multitudinous complications, constituting it an Egyptian labyrinth, the correspondence between Winchester and Dewing, especially letters of the former, being past finding out in certain meaning. Let us look at some circumstances bearing on the question whether Hutton knew that Winchester was Dewing & Sons' agent.

1. In the spring of 1885, Hutton and Winchester made an agreement by which Hutton was to procure lands on Cheat river to be conveyed to Winchester, "or any person he may designate"; the contract itself suggesting some one else interested. A large area was acquired under this. Hutton knew that Winchester had no means of consequence, and that the money paid to those from whom he bought the lands and to himself, and paid in the work of sawing lumber on the Cheat lands, and to buy goods in a supply store run by Hutton and Winchester, paid in various calls and sums, only came through Winchester from some source abroad in copious quantity, if he did not know it was from Dewing & Sons. In the latter part of the summer of 1885, W. S. Dewing, the active member of the firm, visited Winchester at Cheat river bridge, and on his way there met Hutton at Huttonsville, and they went on to Winchester's together, and Hutton remained there in his company several days. This man very plainly was the source of the money supply. And Hutton then, if not before, knew that Winchester was the agent of Dewing & Sons in the Cheat river purchases, "and such other business as was connected with that purchase," to use his language, as he himself states. It was Hutton who, in the Cheat river enterprise, by the terms of the contract with Winchester, was to look up and get the lands, just as in the Gauley river enterprise; and in August, 1885, if not before, he knew Winchester was the agent of the Dewings, and that the lands were to be theirs; and was it not the most ready and reasonable conclusion that so, too, as to the Gauley lands, Winchester was getting them for the Dewings? Was not that conclusion almost inevitable? The enterprises were so closely kindred, the same object in both —that this wealthy firm of Michigan lumber men should

buy up vast areas of the fine timber lands on Cheat and Gauley rivers. Could a man of Hutton's business capacity and experience in such matters, thrown in personal contact with the active member of that firm, who had been, through Winchester, employed to buy the Cheat lands for that firm —could he help concluding that when he in the same way united with this same Winchester to buy the Gauley lands, Winchester was but agent, procuring lands for Dewing & Sons? Whence was the money to come to buy the Gauley lands? From Dewing & Sons, as had the money for Cheat river lands; for from the start all parties understood that the ten *per cent.* cash payment on Gauley purchases was to come through Winchester, agent in the Cheat river land deal, from what was assumed would be Hutton's profits on those Cheat river lands. Dewing & Sons did furnish this money. And it is pertinent to note just in this connection that in the record Hutton calls Winchester the general agent of Dewing & Sons, with full power to negotiate all such purchases of timber lands as his judgment might decide to be for the interest of Dewing & Sons, and he knew he was such agent before he acquired the Gauley lands. Why did he then make these lands an exception to this general agency in this line? Indeed, how help from including them in it?

2. Hutton filed and swore to a bill in Randolph against Dewing & Sons, in which he stated that after the Gauley lands had been secured, W. S. Dewing, the acting partner of the firm of Dewing & Sons, objected to their sale at that time, though they were then salable readily at four dollars per acre; and that Winchester, being the agent of the firm of Dewing & Sons, "and the money of the firm having gone into the purchase of said land, could not and would not agree to sell the same against the consent of the firm"; that an offer of three dollars per acre had been made, but Dewing refused to consent to a sale; that in this situation of Hutton in respect to the land, Dewing asked that all the land be conveyed to him; and Hutton, under such constrained circumstances, by reason of Dewing's refusal to sell, believing that the titles to the land, being in different persons, could to advantage be so placed in the

hands of the Dewings, who had an extensive acquaintance, and were actively in the market in such matters, and could effect better sale, he consented to such conveyance to Dewing. That bill alleged that the lands were conveyed to the Dewings in trust to sell, but they claimed the lands absolutely, and the bill asked that such a trust be declared; whereas the present bill ignores any such trust arrangement, does not pretend that the lands were conveyed to the Dewings otherwise than as their absolute property, but says they were conveyed in ignorance of the fact that Winchester was the agent of the Dewings. Inconsistent theories these. That bill was dismissed. Hutton swore to it 29th May, 1889. Did he then know the fact made the basis of the present bill—the agency of Winchester? If so, it is not the basis of that bill.

He says that in May, 1889, in Judge Woods' room, he saw the letters between Winchester and the Dewings. These letters are chiefly relied on to show Winchester's agency. From them, he says, he first was clearly informed of it. Did he see them before the 29th of May? If so, why on that day sign the bill to set up the trust? If he saw the letters afterwards in May, why file that bill, and base his claim on that hypothesis alone? Why not put the trust arrangement as a ground of relief in this bill? The same parties knew of the trust arrangement, if it existed. Take that dismissed bill's statement that Hutton solicited the Dewings to sell, went to Michigan, where they lived, to induce them to do so. Why do this, if he did not know they were the real owners? Why not persist in inducing Winchester to sell it, if, as Hutton claims, he had sole power to sell? The fact that they had furnished money to buy gave them no power to sell or refuse. A sale at the offer of three dollars would have paid for that. Moreover, it is idle to say that Hutton was constrained to assent to a sale to Dewing & Sons on the theory that by the terms of the partnership Winchester had absolute, irresistible power to sell against Hutton's protest. What writing gave this power? None. The oral agreement, as given, does not give a power so calculated to injure Hutton. A court would have to see a very plain covenant for such a power before allowing

it. Hutton was to find lands to purchase, Winchester to find purchasers to whom sale was to be made by the partnership, or rather, finally, by Hutton, in whose name the contracts were. That was all that was meant. There was no such power in Winchester. In fact Hutton was master of the situation. Nothing compelled him to sell. Not even a writing evidenced the sale to the Dewings. We find a reason for the sale in other considerations than the absolute power of Winchester to sell. Winchester had, with the Dewings' money, started a supply store run by him and Hutton, and expected large lumber plants to be established by the Dewings on Gauley, and, being in their favor, expected to make large money from store and farm supplies for years to come. This was mentioned as an inducement to sell at the time of the negotiation. And then there was another very influential consideration favoring the sale: Who was to find money to pay for the lands under the contracts? If they should lapse, where would go Hutton's profits? Even if he had had means to pay for them, where was a purchaser for them? Even if Dewing & Sons were his partners, they would only have to pay part of the purchase money. Where was the balance to come from? And Hutton would have his part of the land on hand, and where was a purchaser?

He and Winchester made a trip to Richmond, New York, and other Eastern cities, trying to sell. He and Winchester accompanied W. S. Dewing in a trip on foot of nearly a week in the summer of 1886, through these wild mountains, to show him the land and its water ways, to induce him to buy. He says, in the dismissed bill, he was offered three dollars per acre. Who was the bidder? Now, these Gauley lands cost a few cents over one dollar per acre, including expenses, and Dewing & Sons paid two dollars, and Hutton got a profit of nearly twenty five thousand dollars therefrom. Is that no consideration to explain why he consented to sell? These lands lie in wild mountains, far away then from railroads. There was no certainty then of the construction of any soon into that section. There were railroads pointing thitherward merely on paper, but they existed only in hope. That whole large section was on the market at low prices, some

lands as low as fifty cents, the great bulk at one dollar per acre. Since then the West Virginia and Pittsburgh Railroad has been built; but they are still far from it, on heads of the roughest streams of the state, unfloatable, incapable of use in getting out logs except at great expenditure for splash dams. There is no immediate prospect of a railroad there now. These very purchases by Hutton alone give incontestable proof that two dollars was full price. What more proof can be demanded than his purchase of so many thousands of acres at one dollar? There is plenty of other proof in the record. Would not Hutton, or any prudent man, say it was judicious to accept a sale making a profit of one hundred *per cent.* under all the circumstances above detailed, particularly as the options were soon to end, and the wherewithal to close them was a resistless and pressing question? Such considerations plausibly tell us why this sale was made without imputing a sedate scheme of fraud to Dewing & Sons, who furnished every dollar, from first to last entering into these large transactions, and without constraint from Winchester.

3. A disinterested witness (Yeager) introduced by Hutton, says he surveyed the Gauley lands in 1886 and 1887, under an arrangement made with Hutton in 1885, and that Hutton stayed with him at Mullins' while surveying, and Hutton told him the Dewings were to get the land, but does not fix the date. Mullins says that while Yeager and Hutton boarded at his house when surveying, Hutton told him that he was buying the land for Dewing, and this was the first year they surveyed, which Yeager says was 1886. So Hutton must have known then that Winchester was acting for Dewings. Yeager says Winchester so informed him before he went there to survey.

4. Winchester, introduced by Hutton, and who is certainly not prejudiced in favor of the Dewings, was asked, "When did Mr. Hutton learn from you that Dewing & Sons, and not you, were his partners?" and answered, "The night of November 16, 1888." He says Butcher, too, was informed of it then. But Winchester said in another suit that from various circumstances he had been led to believe that Hutton knew of his connection with Dewing be-

fore—he thought in 1887. And here is the proper place to note that Hutton himself, on the stand, after saying that he first learned "absolutely" in 1889 that Dewing & Sons had an interest in the Gauley lands, and being asked whether he did not know they had such interest before that time, gave the equivocal answer, "I did not comprehend this fully till then." He seems to have thus known enough to put him on inquiry, to interrogate Winchester or the Dewings before selling to them, and surely before having deeds executed to them. He said he was free to admit that he knew they were interested in the spring of 1887. Butcher is an attorney, and nephew of Hutton, in constant intercourse with him, and knew all that Hutton knew in these matters. The whole cast of the case shows this. When asked when he first heard of Winchester's being agent for Dewing & Sons "to purchase lands in West Virginia," he answered that he did not remember distinctly, but thought "it was some time in the early summer of 1886." It would seem that this was a general agency as to other lands than on Cheat.

These circumstances above given, and others that might be extracted from the large record confirmatory of them, show that on the 16th of November, 1888, at the very latest, Hutton and Butcher knew of the agency of Winchester. What did they do? Did they stop short off? By no means. They went on to complete the sale by the most solemn acts in the entire transaction. At that date they had paid no purchase money, save about one thousand and two hundred dollars for the ten *per cent.* payments, which came from Dewing & Sons. They had some contracts, which they thereafter consummated with money furnished by Dewing & Sons, every dollar of it. They personally went to the landowners, and procured numerous conveyances straight to W. S. Dewing for Dewing & Sons, and in other instances to Hutton, and he conveyed to them, and in others to Hutton and Butcher who conveyed to Dewing. Not only so, but after that date they purchased other lands to large amounts by fresh purchases, and turned them over to Dewing. And after the Dewings had by their money paid for these lands, and secured them from loss for non-payment, and after Hutton had executed a trust on his realty

for twenty five thousand dollars to Dewing & Sons for money advanced in the Cheat river transaction, and others connected with it, on which the circuit court decreed Dewing & Sons thirty nine thousand dollars against Hutton, which has been reversed without passing on the merits of that debt, and is yet pending, application was made by this suit, begun in April, 1891, to reopen this Gauley transaction, closed by the solemn acts of the parties.

Are adult, competent business men, after so many acts of grave character confirming a sale, meaning nothing but plain intent to confirm a sale alleged to be tainted with deceit and fraud, which acts are numerous, and ran through many months, to be allowed to retract those acts and cancel a sale consummated by the other party by the expenditure of thousands of dollars? These acts estop them. 1 Bigelow, Frauds, 436, says: "The defrauded party to a contract has but one election to rescind the same. If he once determines his election, it is determined forever. Hence, if it be shown that he has at any time after knowledge of the fraud, either by express words or unequivocal acts, affirmed the contract, his election is irrevocable. Nor has the injured party power to keep the question of election open so long as he will." Kerr, Fraud & M. 296, says that, "if a party entitled to impeach a transaction for fraud do an act freely, with an intent to confirm a transaction," which he knew, or might, or ought with reasonable or proper diligence to have known, to be impeachable, it is binding.

In what I have said above I have treated the case on assumption that Dewing & Sons were principals of Winchester, or, through his acts as agent, partners with Hutton; but the Dewings deny both grounds, saying and swearing that Winchester was not their agent as to the Gauley lands, except only to purchase the land as Hutton's under the purchase of January or February, 1887, and knew not and did not approve of the alleged partnership between Winchester and Hutton. The evidence on these matters is conflicting; the circumstances not very conclusive. I repeat that the business was done in so unbusinesslike manner, the whole so complicated, the evidence on important facts so contradictory, the correspondence so enigmatical, the lights

along the way so dim, that a court could not feel author- ized to take any affirmative step with any confidence. The circuit court, upon all this, has refused relief, and we can not see our way to find its decision wrong. *Bartlett* v. *Cleavenger*, 35 W. Va. 719 (14 S. E. 273). The plaintiff seeks to retract solemn deeds on the basis of fraud. The law says he must make the way clear to get such relief.

And what about the equity of the case? Hutton got nearly twenty five thousand dollars profit on these lands, for only personal attention. He spent no money. He made nearly twenty five thousand dollars indisputably on the Gauley lands conveyed to the Dewings, and Dewing swears he made nineteen hundred dollars out of the Porter land, and has a valuable tract of Powell mountain land, which lands the Dewings swear were paid for with their money. No money came from any other quarter. Where is the hardship on Hutton? May not hardship and loss fall on Dewing & Sons? They are far from being "out of the woods" in development or sale of these remote lands. Much evidence of much weight is in this case to show that two dollars was, and likely is today, a full price for them, rendering it questionable whether any loss as from sacrifice sale was suffered by Hutton, even if his pretensions were unquestioned. Would they bring as much in the market as the Dewings gave? I do not say that this would bar re- lief if the fraud were established, and it had not been waived by confirmation of the sale; but it is not foreign to the case in considering the real justice and equities of the case taken as a whole.

The point made by counsel for Dewing & Sons that the decision of this Court in *Dewing* v. *Hutton*, 40 W. Va. 521 (21 S. E. 780) is *res judicata* in this case, is untenable. That decree was reversed, and is no finality now. *Burner* v. *Hevener*, 34 W. Va. 774 (12 S. E. 861). The opinion by Judge Dent in that case settles no principle touching this matter, and, on the contrary, says the commissioner's re- port as to it was unsatisfactory because of indefiniteness in aggregating items which should have been specified separ- ately.

An assignment of error complains that the Dewings

were allowed to file supplemental answer introducing, to sustain the defense of *res judicata,* the record and opinion in this Court in *Dewing* v. *Hutton,* but the brief does not insist on it. It merely introduced a record, requiring no answer by proof—a thing occurring after the first answer, which, if introduced by answer, had to be supplemental. The case was not heard for several months afterwards.

We therefore affirm the decree.